JORDAN FLETCHER (*pro hac vice* application forthcoming)
**FLETCHER LAW, PLLC**
154 Grand Street
New York, New York 10013
Tel: (212) 320-8945
Fax: (347) 983-0046
Email: jordan@fletcherlaw.co

MARK R. CONRAD (CA Bar No. 255667)
GABRIELA KIPNIS (CA Bar No. 284965)
**CONRAD & METLITZKY LLP**
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel:   (415) 343-7100
Fax:   (415) 343-7101
Email: mconrad@conradmetlitzky.com
Email: gkipnis@conradmetlitzky.com

Attorneys for Plaintiff MUDDY WATERS CAPITAL LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MUDDY WATERS CAPITAL LLC, A CALIFORNIA LIMITED LIABILITY COMPANY,<br><br>        Plaintiff,<br><br>   v.<br><br>JOHN DOES 1-10,<br><br>        Defendants. | CASE NO.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Muddy Waters Capital LLC ("MWC" or "Plaintiff") by and through its undersigned counsel Fletcher Law, PLLC, and Conrad & Metlitzky, LLP, for its complaint against John Does 1-10, alleges as follows:

**INTRODUCTION**

1. This is a lawsuit for insider trading against certain unknown individuals or entities who (a) engaged in certain securities transactions on the basis of material non-public information ("MNPI"), and (b) provided the MNPI to the individuals or entities who engaged in the illegal securities transactions.

2. Plaintiff MWC is a private investment firm that conducts and publishes investigative research on publicly-held companies while also taking investment positions based on its research. MWC is widely known as an "activist short-seller," focusing in particular on research and publications concerning companies it believes to be overvalued, often due to management deception, while simultaneously disclosing that it has taken investment positions that would cause MWC to profit from a price decline in those companies' publicly-traded securities.

3. Short-selling is often accomplished by selling a security, such as a stock or bond, that has been borrowed temporarily by the short-seller for the purpose of effecting the short sale transaction. At a date following this initial sale transaction – ideally, for the short-seller, after the security's price has fallen – the short-seller purchases back the shorted securities at the then-current market price and returns them to the original lender. The short-seller thus arbitrages price differences in the security over time, betting on a price decline.

4. In early December 2015, MWC began seeking to establish short positions on several series of bonds issued by the French retail conglomerate Casino Guichard-Perrachon, S.A. ("Casino").[1] In order to set up these short positions, MWC secured confirmation from its prime broker in New York, Merrill Lynch Professional Clearing Corp. ("BAML"), that BAML and its affiliated broker-dealer entities owned and/or controlled by BAML or Bank of America, N.A. (altogether, the "BAML Entities"), could obtain for MWC the Casino bonds for MWC to borrow and thereafter potentially sell to counterparties in the

---

[1] MWC undertook the actions described herein as an agent of and advisor to a partnership entity named MLAF, LP ("MLAF"). MLAF has assigned its rights and claims to MWC for the purposes of this lawsuit.

over-the-counter securities marketplace. Upon information and belief, the BAML Entities then sought buyers ("bids") for these bonds from outside counterparties. (A counterparty buying bonds from the BAML Entities would likely be another broker-dealer acting as an agent for one or more of that broker-dealer's clients.)

5. Initially, the BAML Entities received no financially significant bids for the borrowed Casino bonds; on December 9 and 10, 2015, the BAML Entities arranged for MWC to sell three blocks of Casino bonds for a total price valued at approximately just $5.1 million.

6. However, on December 15, 2015, the BAML Entities presented MWC with four successive bids to sell blocks of Casino bonds for a total price valued at just under $18 million. MWC accepted each of these bids, and executed the trades to sell the blocks of Casino bonds (the "December 15 Transactions").

7. Just a few hours after MWC executed these trades, however, the market closed for the day, and Casino issued a surprise press release trumpeting that it was about to undertake a substantial financial deleveraging plan ("Casino Deleveraging Announcement"). Because Casino was a heavily leveraged company, the plan was perceived by the market as a significant positive development for Casino's bonds. The Casino Deleveraging Announcement caused the price of the Casino bonds that MWC had sold hours earlier to rise substantially – approximately four percentage points, which could have netted a single counterparty to the December 15 Transactions roughly $650,000 to $875,000 in value overnight. This harmed MWC and its principal, MLAF, by diminishing the profits they otherwise might have made when MWC subsequently closed out the short positions on the Casino bonds.

8. MWC does not currently know the identity of the party or parties who directed and served as the ultimate buyer(s) to MWC's sales in the December 15 Transactions ("December 15 Buyers"). However, upon information and belief, the December 15 Buyers were unknown individuals or entities in the marketplace. These individuals or entities may have interacted directly with the BAML Entities, or else they may have traded via their own brokerage firm, which in turn interfaced with the BAML Entities to execute the December 15 Transactions.

9. The December 15 Buyers participated in the December 15 Transactions because, upon information and belief, they possessed material non-public information concerning the fact that Casino would imminently issue its deleveraging announcement the same day.

- 2 -
COMPLAINT

10. The defendants in this lawsuit – John Does 1-10 – are, collectively, the December 15 Buyers and, to the extent that the December 15 Buyers themselves were not Casino insiders, any Casino insiders who provided the December 15 Buyers with MNPI regarding the Casino Deleveraging Announcement.

11. MWC's reasonable belief that the December 15 Buyers traded illegally on the basis of MNPI is based on the facts that (a) for two weeks leading up to the December 15 Transaction, MWC had been unable to locate significant trading partners for the proposed Casino bond sales; (b) markets in securities like the Casino bonds at issue here are typically very slow during the two weeks before Christmas; and, most tellingly, (c) the close temporal proximity between the execution of the December 15 Transactions and the Casino Deleveraging Announcement.

12. MWC asserts claims against John Does 1-10 for federal insider trading in violation of 15 U.S.C. § 78j(b) (2010) and 17 C.F.R. §§ 240.10b5 (1951), 240.10b5-1 (2000) and 240.10b5-2 (2000). MWC brings this private action pursuant to 15 U.S.C. § 78t-1 (1988).

**PARTIES**

13. MWC is a privately-held California limited liability company. Its principal place of business is in San Francisco, California. MWC engaged in the transactions discussed herein as an agent of and sole investment advisor to a Delaware partnership entity named MLAF, LP. MLAF also has its principal place of business in California and has assigned all relevant rights and claims to MWC for the purposes of this lawsuit.

14. John Does 1-10 are unknown individuals or entities who (a) purchased certain blocks of Casino debt securities on December 15, 2015 on the basis of MNPI about Casino (*i.e.*, the December 15 Buyers), and/or (b) in violation of a duty owed to Casino and for personal benefit, provided MNPI concerning Casino and the Casino Deleveraging Announcement to the December 15 Buyers that the December 15 Buyers used in executing the December 15 Transactions.

**JURISDICTION AND VENUE**

15. The Court possesses original jurisdiction over this civil action pursuant to 15 U.S.C. § 78t-1, and venue lies in this District pursuant to 28 U.S.C. § 1391.

- 3 -
COMPLAINT

16. The Court has personal jurisdiction over John Does 1-10 because John Does 1-10 (a) purposefully availed themselves of the privilege of this forum by taking advantage of United States laws and capital markets, and (b) purposefully directed their market manipulation scheme at the United States by, *inter alia*, causing harm that John Does 1-10 knew was likely to be suffered in the United States and that was, in fact, suffered by entities with their principal place of business in this judicial district.

## BACKGROUND

**A.    MWC and the Casino Bond Transactions**

17. Plaintiff MWC is a private investment firm that conducts and publishes investigative research on publicly-held companies while also taking investment positions based on its research. MWC is widely known as an "activist short-seller," focusing in particular on research and publications concerning companies it believes to be overvalued, often due to management deception, while simultaneously disclosing that it has taken investment positions that would cause MWC to profit from a price decline in those companies' publicly-traded securities.

18. Short-selling is accomplished by selling a security, such as a stock or bond, that has been borrowed temporarily by the short-seller for the purpose of effecting the short sale transaction. At a date following this initial sale transaction – ideally, for the short-seller, after the security price has fallen – the short-seller purchases back the shorted securities at the then-current market price and returns them to the original lender. The short-seller thus arbitrages price differences in the security over time, betting on a price decline.

19. In early December 2015, MWC began seeking to establish short positions on certain bonds issued by the French retail conglomerate Casino ("Casino Bonds"). Specifically, MWC sought to short (i) a 3.580% rate bond with a 2025 maturity date ("2025 Bond"), (ii) a 4.498% rate bond with a 2024 maturity date ("2024 Bond"), and (iii) a 4.870% rate perpetual bond (*i.e.*, with no maturity date) ("Perp Bond"). These bonds are traded both over-the-counter via intermediary brokers and on a number of international exchanges.

20. In order to set up these short positions, MWC secured confirmation from BAML, its prime broker in New York, that the BAML Entities could obtain for MWC the Casino Bonds for MWC to borrow. Upon information and belief, the BAML Entities then sought bids for these bonds from their

outside counterparties. (A counterparty buying bonds from the BAML Entities would likely be acting as an agent for one or more of that counterparty's clients.)

21. Although the BAML Entities were able to secure blocks of the Casino Bonds for MWC to borrow, initially, the BAML Entities were not able to locate significant opportunities for MWC to sell those borrowed Casino Bonds. On December 9 and 10, MWC was able to sell approximately $5.1 million worth of the Perp Bond and 2025 Bond. These were relatively small trading amounts for an investment fund such as MWC, which had secured a far higher commitment of borrowed Casino Bonds from the BAML Entities to set up its short positions.

22. Typically, markets for bonds like the Casino Bonds are sluggish and low-volume during the two weeks preceding the Winter holidays. Therefore, although MWC desired to establish sizeable short positions on the Casino Bonds, by the middle of December 2015, high trade volume would have been unusual.

23. However, on December 15, 2015, without prior warning, the BAML Entities presented MWC with four bids for blocks of the 2024 Bond and 2025 Bond. MWC accepted all four bids – *i.e.*, the December 15 Transactions – on behalf of MLAF, for a total sale price worth just under $18 million for all four trades.

24. The December 15 Transactions were domestic transactions. MWC is located in California and initiated the trades from California, on behalf of the California-based Delaware entity MLAF; the trades were arranged, executed and financed via MLAF's prime brokerage account with BAML in New York; the transactions cleared and settled via the BAML Entities in the United States; title to the Casino Bonds passed in New York; and the sale proceeds were paid to MLAF at its New York BAML account.

**B.     The Casino Deleveraging Announcement**

25. Just a few hours after MWC executed the December 15 Transactions, after the markets has closed for the day, Casino issued the Casino Deleveraging Announcement – a surprise press release announcing that it was about to undertake a substantial "financial deleveraging" plan. This plan involved a $2.2 billion restructuring of Casino's operations, primarily through real estate transactions and sales of corporate assets in Latin America and East Asia. This deleveraging plan was not known about publicly prior to the Casino Deleveraging Announcement.

26. The Casino Deleveraging Announcement caused the prices of the Casino Bonds – which MWC had bet against just hours before – to rise precipitously by approximately four percentage points. Such a rise could have netted the counterparties to the December 15 Transactions (*i.e.*, the December 15 Buyers) roughly $650,000 to $875,000 in value overnight.

27. Conversely, this price rise in the Casino Bonds following the Casino Deleveraging Announcement harmed MWC and MLAF by significantly diminishing the profits they otherwise might have made when MWC closed out the short positions on the Casino Bonds several weeks later.

28. The December 15 Buyers are unknown individuals or entities in the marketplace. Upon information and belief, these individuals or entities interacted either directly with the BAML Entities, or else traded indirectly via their own brokerage firm(s), which in turn interfaced as counterparties with the BAML Entities to execute the December 15 Transactions.

29. The December 15 Buyers participated in the December 15 Transactions because, upon information and belief, they possessed MNPI concerning the fact that Casino would imminently issue the Casino Deleveraging Announcement. Thus, it is reasonable to infer that – as MWC alleges – the December 15 Buyers either (a) were themselves individuals with direct access to MNPI regarding Casino's financial plans and operations, or (b) had knowingly received such MNPI from Casino insiders in violation of duties owed by those insiders to Casino. Further, it is reasonable to infer – as MWC alleges – that the December 15 Buyers – if they were not themselves Casino insiders – knew that the Casino insiders benefitted personally from their provision of MNPI to the December 15 Buyers.

30. MWC's reasonable belief as to the December 15 Buyers having traded illegally on the basis of MNPI is based on the facts that (a) for two weeks leading up to the December 15 Transaction, MWC had been unable to locate significant trading partners for its proposed Casino Bond sales; (b) markets in securities like the Casino Bonds are typically very slow during the two weeks before the Winter holidays; and, most tellingly, (c) the close temporal proximity between the execution of the December 15 Transactions and the Casino Deleveraging Announcement.

**C.     The BAML Entities Refuse to Identify the December 15 Buyers**

31. The defendants in this lawsuit – John Does 1-10 – are, collectively, the December 15 Buyers and – to the extent the December 15 Buyers were not themselves Casino insiders – the Casino

insiders who, for personal benefit, provided the December 15 Buyers with MNPI regarding Casino's December 15, 2015 deleveraging plan.

33. In early October 2018, counsel for MWC reached out to the BAML Entities and requested that they reveal to MWC the identities and addresses of the December 15 Buyers or their agents (*i.e.*, the BAML Entities' outside counterparties) so that MWC could prosecute this action with the December 15 Buyers identified as named defendants. The BAML Entities never responded to this request.

33. As of the filing of this lawsuit, the identities of all John Does 1-10, including the December 15 Buyers, are unknown to MWC.

## FIRST CLAIM FOR RELIEF

**(Insider Trading: 15 U.S.C. §§ 78j(b) and 78t-1; and**

**17 C.F.R. §§ 240.10b5, 240.10b5-1 and 240.10b5-2)**

34. Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 33, and incorporates them herein by reference.

35. As set forth above, John Does 1-10 traded in securities on the basis of material, non-public information relating to those securities. Alternatively, in violation of a duty owed to Casino, John Does 1-10 provided MNPI relating to certain securities to individuals who John Does 1-10 knew would thereafter trade in such securities.

36. Specifically, John Does 1-10 purchased the Casino Bonds on or about December 15, 2015 via the BAML Entities directly – or via their own agent brokers who in-turn served as counterparties to the BAML Entities – because John Does 1-10 knew that Casino would imminently issue its Casino Deleveraging Announcement. These December 15 Transactions were domestic transactions.

37. John Does 1-10 learned of this MNPI regarding the Casino Deleveraging Announcement because John Does 1-10 were Casino corporate insiders with direct knowledge of Casino's non-public financial operations and plans.

38. Alternatively, John Does 1-10 (*i.e.*, the December 15 Buyers) received the MNPI concerning the Casino Deleveraging Announcement from others among John Does 1-10 who themselves were Casino corporate insiders. These Casino insiders among John Does 1-10 benefitted personally by

providing MNPI to the December 15 Buyers in violation of their fiduciary duty and/or duty of trust and confidence to Casino, and the December 15 Buyers knew such facts to be the case.

39. MWC and its principal, MLAF, traded contemporaneously with John Does 1-10 in the same securities, *i.e.*, the Casino Bonds.

40. MWC and MLAF were injured financially as a result of John Does 1-10's illegal securities trading activities.

**WHEREFORE**, Plaintiff demands a trial by jury and judgment as follows:

1. Awarding Plaintiff the greater of the total amount of profits gained or losses avoided by John Does 1-10 in connection with their unlawful activities; and
2. Such other and further relief as the Court deems just and proper.

DATED: March 11, 2019          Respectfully submitted,

FLETCHER LAW, PLLC

By: /s/ *Jordan Fletcher*
Jordan Fletcher
Attorneys for MUDDY WATERS CAPITAL LLC

CONRAD & METLITZKY LLP

*/s/ Mark R. Conrad*
MARK R. CONRAD
Attorneys for MUDDY WATERS CAPITAL LLC